## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINDA JARVIS,<br>SARA VILLANUEVA,<br>MONTE J. WOOLERY,<br>TYSHA MARIE SMITH,<br>JACQUE S. WOOD,<br>KURT GLEN,<br>CRAIG L. MOORE,<br>WAYNE E. BROWN,<br>SHAWN A. MIXON,<br>STEPHEN R. PORTER,<br>STEPHANIE LINN SEAWALL,<br>ROXANNA KIPP,<br>JAVIER ENRIQUEZ,<br>IVETTE RIOJAS,<br>RICK OSTDIEK,<br>LAVERNE D. LOEFFELHOLZ,<br>SIMONA SMARANDA VAIPAN,<br>MATT WILSON, and<br>ROXANA NAJERA,<br>Individually and as Class Representatives,<br><br>     Plaintiffs,<br><br>vs.<br><br>MATLINPATTERSON GLOBAL<br>ADVISERS, LLC,<br>MP D CAYMAN L.P.,<br>MP PPP CAYMAN L.P.,<br>MATLINPATTERSON GLOBAL<br>OPPORTUNITIES PARTNERS II L.P.,<br>AND<br>MATLINPATTERSON GLOBAL<br>OPPORTUNITIES PARTNERS<br>(CAYMAN) II L.P.,<br><br>    Defendants. | Civil Action<br><br>Case No.<br><br>**JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiffs, Linda Jarvis, Sara Villanueva and all others listed in the caption as plaintiffs, (collectively, "Plaintiffs"), individually and as class representatives for all similarly situated[1] individuals, by and through their undersigned counsel, bring this Complaint and make the following allegations, in accordance with the numbered paragraphs set forth below:

## NATURE OF ACTION

1.      This action is being brought by former employees of Premium Protein Products, LLC ("Premium") and/or PPP Holdings, LLC ("PPP Holdings") (collectively, "the PPP Entities"), who were terminated without cause as part of, or as a result of, plant shutdowns and/or mass layoffs by and at the PPP Entities' facilities located in Hastings and Lincoln, Nebraska.  At all relevant times hereto and since in or about 2006, defendant, MatlinPatterson Global Advisers, LLC ("Matlin"), MP D Cayman L.P. ("MP D Cayman"), MP PPP Cayman, L.P. ("MP PPP Cayman"), MatlinPatterson Global Opportunities Partners II L.P. ("Matlin II"), and MatlinPatterson Global Opportunities Partners (Cayman) II L.P. ("Matlin (Cayman) II") (collectively, the "Defendants"), have been collectively majority and controlling shareholders of the PPP Entities and have together invested tens of millions dollars in the PPP Entities.  At all relevant times hereto, Defendants have operated as an alter ego and/or a single employer together and with the PPP Entities and their employees and have continued as such up to and including the date of the PPP Entities' declaration of bankruptcy in November 2009.

2.      Specifically, at all relevant times hereto, Defendants maintained direct responsibility for the PPP Entities' strategic, financial, human resources and benefits functions by, among other things, exercising control over the PPP Entities' business plans (including those

---

[1]     The undersigned counsel has presently been directly retained by each of the Plaintiffs, who are all former employees of the Premium Protein Products, LLC and PPP Holdings, LLC, who acted as single employers with the named defendants.

concerning the day-to-day operation of the business) and making decisions to obtain financing, fund the PPP Entities, declare bankruptcy, layoff employees and/or dissolve the company, to the detriment of the PPP Entities and their employees.  In fact, Defendants made the decision to terminate the employees who had worked for the PPP Entities without proper notice, severance, benefits or payment for earned wages, bonuses and other compensation, in violation of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"), the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"); and the Nebraska Wage Payment and Collection Act, 48-1228 - 48-1232 ("NWPCA").  The PPP Entities and Defendants operated as an alter ego/single employer for these purposes and are referred to herein as "The Matlin Group."

3.      The Matlin Group violated the WARN Act by knowingly failing to give Plaintiffs and other persons similarly situated, who are members of the class Plaintiffs seek to represent (the "Class members"), at least 60 days prior notice of termination of their employment as required by that statute.  As a consequence, Plaintiffs and the Class members are entitled to recover from Defendants, under the WARN Act, their wages and other employee benefits for 60 working days following the termination of their employment, which wages and benefits have not been paid.

4.      Also, as a result of the Matlin Group's actions, Plaintiffs and the Class members are entitled to damages from Defendants for violations of ERISA and the NWPCA.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331 and 1367, as well as 29 U.S.C. §§ 2101 et seq.

PHIL1 2170984-1

6.      This Court has personal jurisdiction over Matlin and Matlin II because these entities are incorporated in this judicial district and, therefore, reside here. In addition, this Court has personal jurisdiction over the remaining Defendants because the remaining Defendants have acted at all times pertinent hereto as a "single employer" with Matlin, Matlin II, and PPP Holdings, all residents of the State of Delaware, and with each other as more specifically described below. Furthermore, this Court has personal jurisdiction over defendants, MP D Cayman and MP PPP Cayman, as successors to Matlin II and Matlin (Cayman) II (hereinafter referred to as the "Junior Lenders"), because they do business in the United States individually and through Matlin, a Delaware Corporation. Indeed, the Junior Lenders have previously and specifically availed themselves of this Court's jurisdiction, filing in this judicial district financing statements to perfect their security interests in substantially all of the assets of PPP Holdings, a Delaware corporation, which security interests were provided as an integral part of Matlin's and the Junior Lenders' plan to become controlling shareholders of the PPP Entities, which control gave rise to this litigation.

7.      Venue is proper is this judicial district pursuant to 28 U.S.C. § 1391, including, but not limited to that this is the judicial district where at least two of the Defendants, and an entity with which all of the Defendants are a single employer – PPP Holdings - are incorporated.

## PARTIES

8.      Plaintiffs and the Class members are former employees of the Matlin Group who were terminated by layoff beginning in June 2009 and continuing through November 2009 without 60-days notice of termination under the WARN Act.

9.      Premium was organized under the laws of the State of Kansas in April 2003, and was in the business of meat packing. At all relevant times hereto, Premium operated two

4

production facilities: (1) a slaughter operation facility in Hastings, Nebraska ("Hastings Facility"); and (2) a fabrication operation facility in Lincoln, Nebraska (the "Lincoln Facility") (collectively the "Facilities").

10.  PPP Holdings is a Delaware limited liability corporation and is the sole owner and sole member of Premium. When in business, PPP Holdings shared with Premium its principal place of business address, which was 4611 West Adams St., Lincoln, NE 68524.

11.  On or about November 10, 2009 (the "Petition Date"), the PPP Entities filed voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code").2

12.  Defendant Matlin is a limited liability company organized and existing under the laws of the State of Delaware and has a principal place of business at 520 Madison Avenue, New York, NY 10022-4213. It is a private equity firm specializing in making controlling investments in distressed companies like the PPP Entities.

13.  Defendant Matlin II is a limited partnership organized and existing under the laws of the State of Delaware and has a principal place of business at 520 Madison Avenue, New York, NY 10022. According to Matlin II, it "was formed to invest globally in the severely discounted securities and obligations of financially distressed companies with the objective of obtaining corporate control." Many of the officers and partners of Matlin II also serve as officers and/or partners/members of Matlin and Matlin (Cayman) II. Upon information and belief,

---

2    The PPP Entities are not listed as a defendants in this action due to the fact that they filed for bankruptcy in United States Bankruptcy Court for the District of Nebraska, at Docket Numbers 09-43291 and 09-43292 (the "Bankruptcy Proceeding"). Plaintiffs Linda Jarvis and Sara Villanueva, and a third plaintiff, initiated adversary proceedings against the PPP Entities in the Nebraska Bankruptcy Court. In or about June 2010, however, the PPP Entities were sold by way of auction. Matlin, who was included on Schedule D - Creditors Holding Secured Priority Claims - in the Bankruptcy Proceeding as a secured creditor of the PPP Entities, upon information and belief, received a portion of the proceeds of that sale. None of the Plaintiffs herein or the Class members, however, received any portion of the proceeds nor were their claims adjudicated.

Matlin II acquired shares in the PPP Entities for the sole purpose of gaining corporate control over them.

14.     Defendant Matlin (Cayman) II is a limited partnership Caymans entity formed in May 2003 with the same business address as Matlin and Matlin II – 520 Madison Avenue, New York, NY 10022.  It also has a registered office address in the Cayman Islands as follows: Walkers Corporate Services Limited, Walker House, 87 Mary Street, Cayman Islands.  This is the same registered office address as MP D Cayman and MP PPP Cayman, who are believed to be successors to Matlin II and Matlin (Cayman) II.  Matlin (Cayman) II shares at least one member and/or officer/director with Matlin II, a Delaware partnership.  Upon information and belief, Matlin (Cayman) II acquired shares in the PPP Entities for the sole purpose of gaining corporate control over them.

15.     MP D Cayman is a Cayman Islands entity with a registered office address at Walkers Corporate Services Limited, Walker House, 87 Mary Street, Cayman Islands.  This is the same registered office address as Matlin (Cayman) II, which entity has the same business address as Matlin, a Delaware LLC.  Upon information and belief, MP D Cayman was formed and/or operated for the sole purpose of gaining corporate control over the PPP Entities.

16.     MP PPP Cayman is a Cayman Islands entity with a registered office address in the Cayman Islands as follows: Walkers Corporate Services Limited, Walker House, 87 Mary Street, Cayman Islands.  This is the same registered office address as Matlin (Cayman) II.  Upon information and belief, MP PPP Cayman was formed and/or operated for the sole purpose of gaining corporate control over the PPP Entities.  Indeed, the "PPP" initials in its name are believed to stand for Premium Protein Products.

6

17.    In 2006 and as it was amended in 2007, Premium entered into a Subordination Credit Agreement (the "Credit Agreement"), with the Junior Lenders (defendants, MP D Cayman and MP PPP Cayman, as successors to Matlin II and Matlin (Cayman) II). Defendant Matlin served as the Administrative Agent to the Credit Agreement and for the Junior Lenders.

18.    Over the course of time and until on or about October 31, 2009, the Junior Lenders and Matlin loaned Premium and administered over $32 million under the Credit Agreement. Notably, Matlin, not the Junior Lenders, was the entity listed on Schedule D - Creditors Holding Secured Priority Claims, which was filed in the Bankruptcy Proceeding, as a creditor of the PPP Entities for the amount purportedly loaned under the Credit Agreement.

19.    As a result of the significant loans the Junior Lenders and Matlin made to the PPP Entities, the Junior Lenders and Matlin, acting as a single employer with each other, became majority owners of the PPP Entities and assumed control over the PPP Entities. This was in accordance with the business purpose of Defendants, some of whom have touted themselves on the internet as companies who implement a "global strategy" to obtain "corporate control" over those distressed companies in which they invest.

20.    Also, on or about November 17, 2006, the PPP Entities, the Junior Lenders, and others entered into a Co-Borrower Assumption Agreement, whereby PPP Holdings granted the Junior Lenders a security interest in substantially all of PPP Holdings' assets to secure Premium's obligations under the Credit Agreement. To secure this interest, the Junior Lenders filed a financing statement in the office of the Secretary of Delaware.

21.    By at least the middle of 2008, Defendants took complete control over and directed, on a day-to-day basis, the business operations of the PPP Entities, as more fully explained below.

22.     Plaintiffs bring this action on their own behalf and, pursuant to the WARN Act, and Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class members who are all other persons similarly situated.

## FACTUAL ALLEGATIONS

23.     At all relevant times hereto, the Matlin Group collectively employed between 300 and 400 employees at the Facilities.

24.     In or about 2003, Steve Sands ("Sands") became the President and Chairman of the Board of Directors of the PPP Entities.

25.     In or about early 2007, Kevin Miller ("Miller") was hired to be the Chief Financing Officer of the PPP Entities.  Also in 2007, Erin McDermott ("McDermott") was hired as the Personnel Manager.

26.     Beginning in or about 2006, Defendants, which have made a business of coming to the aid of distressed companies, stepping in and controlling them, loaned tens of millions of dollars to the PPP Entities.

27.     From 2006 to the middle of 2008, the PPP Entities had grown to be one of the largest processors of organic and natural beef in the country.

28.     In the middle of 2008, however, the financial state of the PPP Entities began to change.  It was at this time that the national and international demand for the PPP Entities' products began to steadily and significantly decline.  As a result, the Matlin Group began losing substantial amounts of money.

29.     In their efforts to save the Matlin Group from financial ruin, Defendants decided to take over the day-to-day operations of the PPP Entities, which included making personnel and strategic business decisions, and controlling all of the financial decisions for the PPP Entities.

30.     Specifically, among other things, Defendants made the decision: (a) first to promote Miller to CEO but then to shortly thereafter replace him with its employee, Kevin Yost ("Yost"); (b) to hire Scott Vuchetich ("Vuchetich") as the CFO of the PPP Entities; (c) to terminate the PPP Entities' manager of the Hastings Facility, Mike Gager ("Gager"); and (d) to hire Ronald Gould ("Gould") to replace Gager.   At all relevant times hereto, the salaries and other compensation of Yost, Vuchetich and Gould were being paid directly by the Defendants, not by the PPP Entities.

31.     Also, the Defendants made the decision to terminate dozens of employees at the Lincoln Facility and to loan tens of millions of dollars to the PPP Entities, pursuant to which they would become controlling shareholders and would have security interests in substantially all of the assets of the PPP Entities.

32.     Further, as early as in or about the middle of 2008 - when Gould became employed by Defendants to manage the Hastings Facility – Gould informed the Matlin Group's employees that, if the company did not begin to make a profit by April 2009, Defendants would shut it down.

33.     As Defendants were making these decisions and dealing directly with the employees working at the Facilities, it was disregarding completely any input from one of the few remaining officers being paid by Premium, Sands.   In fact, Defendants eventually entirely excluded Sands from the day-to-day decisions Defendants were making.   Indeed, to the end of gaining complete control over the decisions being made about the Matlin Group, Defendants, in effect, relieved Sands from his responsibilities as the President and Chairman of the Board of Directors and sent him on fruitless business trips to physically remove him from the company.

9

34.     Despite the decisions Defendants made concerning the PPP Entities, as early as April 2009, it became clear to Defendants that the PPP Entities would never be able to generate enough profit to enable them to remain in business. Upon information and belief, for some time before this, the Matlin Group had been losing hundreds of thousands of dollars per day by remaining open.

35.     Accordingly, in or about early June 2009, ten employees of Defendants, including Yost, Vuchetich, and Gould, as well as the only Premium employee in attendance, McDermott, met at the Cornhusker Hotel in Lincoln, Nebraska, to discussed the company's future. This meeting will hereinafter be referred to as the "June 2009 Meeting."

36.     At the June 2009 Meeting, the Matlin Group executives decided that they would close the Facilities only three days from then. In response, McDermott reminded the Matlin Group executives that the WARN Act required the Matlin Group to provide to their employees 60-days prior notice of a company shut-down. One of the Matlin Group executives responded that the Matlin Group would not provide such notice because: (a) it was losing money (even though the Matlin Group had been losing money for many months before then); and (b) it believed that it could avoid having to provide such notice if the PPP Entities simply filed for bankruptcy.

37.     McDermott also informed the Matlin Group executives that the employees were entitled to be paid any accrued vacation time regardless of whether the employees were laid off, terminated, resigned, or retired.

38.     The Matlin Group executives deliberately scoffed at their moral and legal responsibilities to their employees. Specifically, despite knowing their legal duties under the WARN Act, ERISA, and the NWPCA, on or about June 10, 2009, the Matlin Group executed on

10

the decision it had made at the June 2009 Meeting. It closed the Facilities while telling the Matlin Group employees that the closures were merely temporary furloughs. The Matlin Group did so without providing 60-days notice of the closings, and without paying the employees all of their accrued vacation time on or before the next regularly scheduled pay day.

39.     Just weeks later, in July 2009, Sands and McDermott resigned because they were disheartened by and strongly disagreed with the Matlin Group's executives' refusal to honor their obligations to the Matlin Group's employees. Indeed, neither Sands (who was one of the few remaining executives still being paid by Premium) nor McDermott made or had any input into the decision to close the Facilities. Sands and McDermott also knew that the "furloughs" in June 2009 were, in reality, permanent plant closings.

40.     Despite the fact that, as early as months before the first purported "furlough," it was or should have been obvious to the Matlin Group executives that the Matlin Group's financial condition was too dire to continue in business, the Matlin Group disingenuously characterized its decision in June 2009 as a "furlough."

41.     In reality, Sands and McDermott were correct. The employment decision affecting the Facilities was not a "furlough" but, rather, a permanent "plant closing" and "mass layoff" under the WARN Act.

42.     Indeed, from the initial "furlough" to the time when the PPP Entities declared bankruptcy in November 2009, the Matlin Group did not reopen the facilities or recall its employees. Instead, it left telephone messages every two weeks for their employees extending the purported "furloughs" for another two weeks. At no time prior to filing for bankruptcy did the Matlin Group inform the employees that the plants would not reopen or provide them with any business justification for its failure to provide WARN Act notification.

43.     As a result, for months, many of the Plaintiffs and the Class members were left in "job limbo," not wanting to attempt to seek alternative employment because they were being led to believe that they would be able to return to work within two weeks of the most recent call from the Matlin Group.

44.     The Matlin Group deliberately deprived Plaintiffs and the Class members of that which the WARN Act is intended to ensure - transition time to adjust to the prospective loss of employment, to seek and obtain other jobs, and, if necessary, to enter skill training or retraining that would have allowed them to compete successfully in the job market.

45.     The Matlin Group knew or should have known at least 60 days prior to the first June 2009 "furlough" that it was likely that the Matlin Group would be required to shutdown or have significant mass lay-offs because of the economic climate and business trends.

46.     The Matlin Group's decision to "furlough" employees beginning in June 2009, on information and belief, was nothing other than a misguided and fraudulent attempt to evade the requirements of the WARN Act because there was no legitimate intention at the time of the first furlough or anytime thereafter to reopen the facilities. Hence, all employees as of June 2009 should remain eligible for the WARN violation.

47.     The Matlin Group willfully, negligently, or recklessly failed to give adequate notice of the potential shutdown/layoffs as required by the WARN Act.

48.     Also, upon information and belief, both before June 2009 and from June 2009 to November 10, 2009, there is no evidence that Defendants were actively seeking financing of the PPP Entities to save the PPP Entities or reopen the Facilities. Instead, at most, from June to November 2009, Defendants offered to sell the PPP Entities for the inflated and exorbitant price of $18 million. Not surprisingly, Defendants only obtained two bids, one for $3 million and one

12

for $11 million. In offering to sell the PPP Entities at a price that was grossly inflated, Defendants were seeking only to benefit itself at the expense of the PPP Entities and their hundreds of employees.

49.     Similarly, there is no indication that a potential financier would have declined to provide financing if Defendants had provided the 60-days prior notice under the WARN Act.

50.     Accordingly, without excuse or justification, Defendants showed no regard for their obligations to their employees working at the Facilities and has no defense for failing to provide Plaintiffs and the Class members with the required WARN Act notice and deciding to not pay all of the benefits to which they are entitled.

51.     When Defendants caused the PPP Entities to file for bankruptcy, it knew or reasonably should have known that it, as a secured creditor, would be paid a portion of the price at which the PPP Entities would be sold, but that such an amount would be wholly inadequate to pay their employees anything. In fact, this is exactly what occurred.

52.     At no time since June 2009 (including at any time after the November 10 bankruptcy filing) has the Matlin Group paid its employees the accumulated vacation pay to which each is entitled.

## CLASS ALLEGATIONS

53.     Plaintiffs and the Class members repeat and re-allege the allegations of the preceding paragraphs as though set forth fully herein.

## A.    DEFINITION OF THE CLASS

54.     Plaintiffs and the other similarly situated former employees constitute a Class within the meaning of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

55.     The Class is defined as all of those employees who were employed by the Matlin Group (in facilities with greater than 50 employees), and who became "affected employees"

13

because they suffered "employment losses" as a direct and proximate result of the plant closing and/or mass layoffs in June 2009 or thereafter, and to whom the Matlin Group failed to provide notice in compliance with the WARN Act.

**B.    NUMEROSITY**

56.    The Class is so numerous as to render joinder of all members impracticable as there are over 500 former employees believed to be in the Class. The identities of a majority of the Class members are presently unknown but are ascertainable through appropriate discovery.

**C.    EXISTENCE AND PREDOMINANCE OF COMMON ISSUES**

57.    Common questions of law and fact are applicable to all Class members.

58.    The common questions of law and fact arise from and concern the following facts and actions:

a.    all Class members are former employees of the Matlin Group;

b.    all Class members enjoyed the protection of the WARN Act;

c.    the Matlin Group, as a single employer, terminated the employment of all the Class members;

d.    the Matlin Group, as a single employer, terminated the employment of the Class members without providing at least 60 days' prior written notice as required by the WARN Act;

e.    the Matlin Group, as a single employer, failed to pay wages to the Class members and failed to provide other employee benefits for the 60-working-day period following their respective terminations of their employment in violation of the WARN Act and the NWPCA.

14

59.     The questions of law and fact common to the Class members, as described above, predominate over any questions affecting only individual members, and thus, this class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**D.     TYPICALITY**

60.     Plaintiffs' claims are typical of the claims of other Class members.  All such claims arise out of the Matlin Group's violation of the NWPCA and its failure to provide notice under the WARN Act and to timely disclose to employees that they would be laid off as a result of the plant closing and/or mass layoffs.  Plaintiffs and other Class members have suffered a common injury arising out of the Matlin Group's common course of conduct as alleged herein.

**E.     ADEQUATE REPRESENTATION**

61.     Plaintiffs will fairly and adequately protect and represent the interests of the Class members and have no interest antagonistic to or in conflict with those of other Class members.

62.     Plaintiffs have the time and resources to prosecute this action and have retained qualified counsel who have had extensive experience in matters involving employee rights, the WARN Act, and federal court litigation.  Plaintiffs intend to prosecute this action vigorously for the benefit of the Class members.

**F.     SUPERIORITY**

63.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy because individual joinder of all Class members is impractical. Furthermore, damages suffered by Class members may be relatively small when compared to the expense and burden of individual litigation, which would make it difficult or impossible for individual Class members to obtain relief.  The interests of judicial economy favor adjudicating the claims of the Class on a classwide basis rather than an individual basis.

15

## G.    RISKS OF INCONSISTENT OR VARYING ADJUDICATION

64.    Class treatment is proper in this proceeding in order to avoid inconsistent or varying adjudications with respect to individual Class members. Separate actions by individual Class members would create a risk that adjudication of disputed issues of law or fact as to some of the former non-bargaining unit employees would be binding upon other Class members not party to the adjudication, or would otherwise substantially impair or impede their ability to protect their interests.

65.    Pursuant to Fed. R. Civ. P. 23(a), the Class meets all the requirements for class certification.

66.    Class certification is also authorized by the WARN Act, 29 U.S.C. § 2104(a)(5).

## STATEMENT OF CLAIMS

### COUNT I
### WARN ACT
### (All Named Plaintiffs v. All Defendants)

67.    Plaintiffs, on behalf of themselves and the Class members, repeat and re-allege the allegations of the preceding paragraphs as if fully stated herein.

68.    Plaintiffs bring this action pursuant to 29 U.S.C. § 2104(a)(5).

69.    As alleged above, at all relevant times herein, Defendants exercised de facto control over the PPP Entities and made the decision to terminate employees without proper WARN Act notice. Also, Defendants placed its employees on the executive board of the PPP Entities and directed decisions affecting the day-to-day operations of the PPP Entities, including the companies' shut down. As such, Defendants and the PPP Entities are alter egos of each other and constitute a single employer under the WARN Act.

16

70.     At all relevant times hereto, the Matlin Group had more than 100 full-time employees within the United States.

71.     At all relevant times hereto, the Matlin Group employed more than 100 employees who, in the aggregate, worked at least 4, 000 hours per week, exlcusive of hours of overtime, within the United States.

72.     At all relevant times hereto, the Matlin Group was an "employer" as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. §639.3(a).

73.     On or about June 2009 and thereafter, the Matlin Group effected one or more "plant closings" or "mass layoffs," as those terms are defined by 29 U.S.C. § 2101(a)(2) and (3).

74.     The complete shutdown of the offices as "facilities and operating units" constitutes a "plant closing" within the meaning of 29 U.S.C. § 2102(a)(2), making persons "affected employees" as a direct and proximate result of the failure to give notice as required under the WARN Act.

75.     Alternatively, layoffs resulted in an employment loss of: more than 1/3 of the Matlin Group's employees, at pertinent "single sites of employment," and as such constituted "mass layoffs" within the meaning of 29 U.S.C. § 2101(a)(3) in that at least 33% of the total employees (excluding any part-time employees) and at least 50 employees (again excluding any part-time employees) experienced an "employment loss" at single sites of employment; or at least 500 employees (company-wide).

76.     Plaintiffs were longtime employees of the Matlin Group.

77.     Plaintiffs were laid off on or about June 2009 and thereafter without cause on their part or as the reasonably foreseeable consequence of a plant closing and/or mass

layoffs ordered by the Matlin Group and are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

78.     The plant closings and/or mass layoffs resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(6), at one or more single sites of employment. The Matlin Group failed to give written notice of the plant closing and/or mass layoffs to the "affected employees" prior to the actual date of the closings and/or layoffs.

79.     The WARN Act required that the Matlin Group give Plaintiffs at least 60 days prior written notice of termination of employment.

80.     Prior to the termination of employment, Plaintiffs did not receive written notice from the Matlin Group that complied with the requirements of the WARN Act.

81.     The Matlin Group failed to pay Plaintiffs their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 working days following the respective terminations of their employment.

82.     The Matlin Group also failed to make pension and 401(k) contributions as required, and failed to provide health insurance coverage and other employee benefits under ERISA to Plaintiffs for 60 calendar days from and after the dates of the respective terminations of their employment.

83.     The Matlin Group's failure to provide Plaintiffs with at least sixty (60) days prior written notice of the termination of employment was a violation of federal law, the WARN Act. The WARN Act specifically provides that employers who violate the WARN Act are liable for "back pay" for each day of violation. 29 U.S.C. § 2104(a)(i)(A).

84.     Because of the Matlin Group's failure under the WARN Act, Plaintiffs are entitled to payment for their respective wages, salary, commissions, bonuses, accrued holiday

18

pay and accrued vacation for "the period for the violation, up to a maximum of sixty (60) days." 29 U.S.C. § 2104(a)(1).

85. As a result of the Matlin Group's violation of the WARN Act, Plaintiffs have been damaged in amounts equal to the sum of: (a) their respective lost wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension contributions and 401(K) contributions for 60 working days; (b) the health and medical insurance and other fringe benefits under the ERISA that they would have received or had the benefit of receiving, for a period of 60 working days after the date of their termination; (c) the medical expenses incurred during such period by them that would have been covered and paid under the Matlin Group employee benefit plans had that coverage continued for that period; and (d) interest for the time value of the lost wages and benefits.

**COUNT II**
**WARN ACT**
**(Claim of Other Similarly Situated Employees)**

86. Plaintiffs, on behalf of themselves and other employees who were similarly situated, repeat and re-allege the allegations of the preceding paragraphs as if fully restated herein.

87. At or about the time that Plaintiffs were discharged or shortly thereafter, the Matlin Group also discharged hundreds of other employees, the Class members, who worked for the Matlin Group and are similarly situated former employees.

88. Pursuant to 29 U.S.C. § 2104(a)(5), Plaintiffs assert the claims raised in this proceeding on behalf of the Class members for them or their benefit.

89. Each of the Class members is similarly situated to the named Plaintiffs in respect to their rights under the WARN Act.

90.     At all relevant times, the Matlin Group employed more than 100 employees who, in the aggregate, worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

91.     At all times relevant, the Matlin Group was an "employer" as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639.3(a).

92.     In June 2009 or thereafter, the Matlin Group effected one or more "plant closing" or "mass layoffs," as those terms are defined by 29 U.S.C. § 2101(a)(2) and (3).

93.     The complete shutdown of the offices as "facilities or operating units" constitutes a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2), making all persons "affected employees" as a direct and proximate result of the failure to give notice as required under the WARN Act.

94.     Alternatively, the layoffs by the Matlin Group resulted in an employment loss of more than 1/3 of the Matlin Group's employees, at pertinent "single sites of employment," and as such constituted a "mass layoff" (or layoffs) within the meaning of 29 U.S.C. § 2101(a)(3) in that at least 33% of the total employees (excluding any part-time employees) and at least 50 employees (again excluding any part-time employees) experienced an "employment loss" at single sites of employment; or at least 500 employees (company-wide).

95.     The Matlin Group discharged each of the Class members in June 2009 or thereafter without cause on his or her part as part of a plant closing and/or mass layoffs.

96.     The plant closings and/or mass layoffs resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(6), at one or more single sites of employment.   The Matlin Group failed to give written notice of the plant closings and/or mass layoffs to the

20

"affected employees" as required by the WARN Act, 29 U.S.C. § 2102, prior to the actual date of the closings and/or mass layoffs.

97.     The Matlin Group was required by the WARN Act to give each of the Class members at least 60 days prior written notice of the termination of their employment.

98.     Prior to the termination of their employment, the Class members did not receive written notice from the Matlin Group that complied with the requirements of the WARN Act.

99.     The Matlin Group failed to pay the Class members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 working days following the respective terminations of their employment.

100.    The Matlin Group also failed to make the pension and 401(k) contributions and to provide health insurance coverage and other employee benefits under ERISA to the Class members for 60 days from and after the dates of the respective terminations of their employment.

101.    The Matlin Group's failure to provide the Class members with at least sixty (60) days prior written notice of the termination of their employment was a violation of federal law, the WARN Act. The WARN Act specifically provides employers that violate the WARN Act are liable for "back pay" for each day of violation. 29 U.S.C. § 2104(a)(i)(A).

102.    Because of the Matlin Group's failure under the WARN Act, the Class members are entitled to payment for their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for "the period for the violation, up to a maximum of sixty (60) days." 29 U.S.C. § 2104(a)(1).

103.    As a result of the Matlin Group's violation of the WARN Act, the Class members have been damaged in amounts equal to the sum of: (a) their respective lost wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension contributions and

21

401 (k) contributions for 60 working days; (b) the health and medical insurance and other fringe benefits under the Employee Retirement Income Security Act ("ERISA") that they would have received or had the benefit of receiving, for a period of 60 working days after the dates of the respective terminations of their employment; (c) the medical expenses incurred during such period by such persons that would have been covered and paid under the Matlin Group's employee benefit plans had that coverage continued for that period; and (d) interest for the time value of the lost wages and benefits.

**COUNT III**
**NEBRASKA WAGE PAYMENT AND COLLECTION ACT**
**(Plaintiffs and the Class members v. Defendants)**

104.    Plaintiffs, on behalf of themselves and other employees who were similarly situated, repeat and re-allege the allegations of the preceding paragraphs as if fully restated herein.

105.    At all pertinent times hereto, the Matlin Group was an "employer" under the NWPCA.

106.    As part of their employment with the Matlin Group, Plaintiffs and the Class members were each offered employment that entitled them to the right to obtain certain payments in the form of wages, salary, vacation benefits, bonuses, retention bonuses or deferred compensation.

107.    Plaintiffs and the Class members fully complied with all terms of their employment, and, yet, the Matlin Group, as a single employer, has not honored payments to be made to them under the terms of their employment.

22

108.    The Matlin Group's actions are in violation of the NWPCA, as a failure to pay earned wages, and, as this was willful, are subject to payment of a penalty in accordance with Neb. Rev. Stat. 48-1232.

109.    As a result of these said violations of the NWPCA, Plaintiffs and the Class members have been damaged in amounts equal to the sum of:  (a) their respective lost payments under the terms of their employment with the Matlin Group; and (b) attorneys' fees.

**WHEREFORE,** Plaintiffs and the Class members, demand judgment, against Defendants as follows:

a.      A money judgment in favor of Plaintiffs and the Class members, equal to the sum of: (a) unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay and pension and 401(k) contributions for 60 working days; (b) the benefit of health and medical insurance and other fringe benefits under ERISA for 60 working days; and (c) any medical or other expenses incurred during the 60 working days since the respective terminations of their employment that would have been covered and paid under the Matlin Group's benefit plans had that coverage continued for that period, all determined in accordance with the WARN Act, 29 U.S.C. § 2104 (a)(1)(A);

b.      Their respective lost payments under the terms of their employment with the Matlin Group as are awardable under the NWPCA;

c.      Certification that Plaintiffs and the Class members constitute a single class;

d.      Attorneys' fees paid to Plaintiffs and the Class members, as well as a penalty payment, both as allowed by law on the amounts owed under the preceding paragraphs; and

23

e.     Such other and further relief as this Court may deem just and proper.

Dated:  June 8, 2012                          KLEHR HARRISON HARVEY BRANZBURG LLP

                                  By:      /s/ David S. Eagle
                                           David S. Eagle (DE Bar No. 3387)
                                           Sean M. Brennecke (DE Bar No. 4686)
                                           919 Market Street, Suite 1000
                                           Wilmington, Delaware 19801
                                           Telephone:  (302) 552-5508
                                           Facsimile:  (302) 426-9193
                                           deagle@klehr.com
                                           sbrennecke@klehr.com

                                           - and -

                                           Charles A. Ercole, Esquire*
                                           Lee D. Moylan, Esquire*
                                           1835 Market Street, Suite 1400
                                           Philadelphia, PA  19103
                                           Telephone: (215) 568-2852
                                           Facsimile: (215) 568-6603
                                           cercole@klehr.com
                                           lmoylan@klehr.com

                                           *Attorneys for Plaintiffs*
                                           * *Pro Hac Vice* Motions to be filed

24