**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| MONTE J. WOOLERY,<br>TYSHA MARIE SMITH,<br>JACQUE S. WOOD,<br>KURT GLEN,<br>CRAIG L. MOORE,<br>WAYNE E. BROWN,<br>SHAWN A. MIXON,<br>STEPHEN R. PORTER,<br>STEPHANIE LINN SEAWALL,<br>ROXANNA KIPP,<br>JAVIER ENRIQUEZ,<br>IVETTE RIOJAS,<br>RICK OSTDIEK,<br>LAVERNE D. LOEFFELHOLZ,<br>SIMONA SMARANDA VAIPAN,<br>MATT WILSON, and<br>ROXANA NAJERA,<br>Individually and as Class Representatives,<br><br>       Plaintiffs,<br><br><br><br>vs.<br><br>MATLINPATTERSON GLOBAL<br>ADVISERS, LLC,<br>MATLINPATTERSON PE HOLDINGS,<br>LLC, MATLINPATTERSON GLOBAL<br>PARTNERS, II, LLC, and<br>MATLINPATTERSON GLOBAL<br>OPPORTUNITIES PARTNERS II, L.P.,<br><br>       Defendants. | C.A. No.  1:12-cv-00726 (RGA)<br><br>**JURY DEMAND** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Monte J. Woolery and all others listed in the caption as plaintiffs (collectively, "Plaintiffs"), individually and as class representatives for all similarly situated[1] individuals, by and through their undersigned counsel, bring this First Amended Complaint and make the following allegations, in accordance with the numbered paragraphs set forth below:

## <u>NATURE OF ACTION</u>

1.     This action is being brought by former employees of Premium Protein Products, LLC ("Premium") and PPP Holdings, LLC ("PPP Holdings") (collectively, "the PPP Entities"), who were terminated without cause as part of, or as a result of, plant shutdowns and/or mass layoffs by and at the PPP Entities' facilities located in Hastings and Lincoln, Nebraska.

2.     On or about November 1, 2006, defendants, MatlinPatterson PE Holdings, LLC (formerly MatlinPatterson Asset Management LLC) ("Matlin PE Holdings"), MatlinPatterson Global Partners II, LP ("Matlin Global Partners"), MatlinPatterson Global Advisers, LLC ("Matlin"), and MatlinPatterson Global Opportunities Partners II L.P. ("Matlin Global Opportunities Partners") (collectively, the "Defendants"), either directly or through each other, obtained an indirect or direct majority ownership interest in the PPP Entities.  As majority owners, Matlin, Matlin Global Opportunities Partners, and another entity – Matlin Global Opportunities Partners (Cayman) II ("Matlin Global Opportunities Partners Cayman)" – extended loans over time to Premium and/or PPP Holdings (as co-obligors) amounting to more than thirty (30) million dollars.  Defendant Matlin served as the "Administrative Agent" and investment advisor for the investment that the Defendants had made in Premium.  To secure its and Premium's obligations under the loan agreement(s) pursuant to which these loans were

---

[1]     The undersigned counsel has presently been directly retained by each of the Plaintiffs, who are all former employees of the Premium Protein Products, LLC and PPP Holdings, LLC, who acted as single employers with the named defendants.

made, PPP Holdings gave Matlin, Matlin Global Opportunities Partners,  and Matlin Global Opportunities Partners Cayman a security interest in all of PPP Holdings' assets.  At all relevant times hereto, Defendants have operated as a single employer together and with the PPP Entities and continued as such up to and including the date when the PPP Entities declared bankruptcy in November 2009.

3.      Specifically, at all relevant times hereto, Defendants, by and through each other, maintained direct responsibility for the PPP Entities' strategic, financial, human resources, and benefits functions by, among other things, exercising control over the PPP Entities' business plans (including those concerning the day-to-day operation of the business) and making decisions to extend financing or otherwise fund the PPP Entities, declare bankruptcy, pay benefits due, furlough//layoff employees and/or dissolve the company, to the detriment of the PPP Entities and their employees.  In fact, Defendants, individually and with each other, made the precise decision from which this cause of action stems - to terminate the employees who had worked for the PPP Entities without proper notice, severance, benefits or payment for earned wages, bonuses and other compensation, with the intent to evade their obligations under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"), the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"); and the Nebraska Wage Payment and Collection Act, 48-1228 - 48-1232 ("NWPCA").  The PPP Entities and Defendants operated as a single employer for these purposes and are referred to herein as "The Matlin Group."

4.      The Matlin Group violated the WARN Act by knowingly failing to give Plaintiffs and other persons similarly situated, who are members of the class Plaintiffs seek to represent (the "Class members"), at least 60 days prior notice of termination of their employment as

required by that statute.  As a consequence, Plaintiffs and the Class members are entitled to recover from Defendants, under the WARN Act, their wages and other employee benefits for 60 working days following the termination of their employment, which wages and benefits have not been paid.

5.      Also, as a result of certain individuals employed by the Defendants, Plaintiffs and the Class members are entitled to damages from those individually-named defendants for violations of the NWPCA.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331 and 1367, as well as 29 U.S.C. §§ 2101 et seq.

7.      This Court has personal jurisdiction over Defendants because each are incorporated in this judicial district.

8.      Venue is proper is this judicial district pursuant to 28 U.S.C. § 1391, because Defendants are incorporated in this judicial district and, therefore, reside here.

## FACTUAL ALLEGATIONS CONCERNING
## THE PARTIES AND THEIR RELATIONSHIP TO EACH OTHER

9.      Plaintiffs and the Class members are former employees of the Matlin Group who were, without 60-days notice of termination under the WARN Act, terminated in at least November 2009, after having been "furloughed" since June 2009.

10.      Premium was organized in April 2003 under the laws of the State of Kansas, and was in the business of meat packing.  Premium originally operated three production facilities: (1) a slaughter operation facility in Hastings, Nebraska ("Hastings Facility"); (2) a fabrication operation facility in Lincoln, Nebraska (the "Lincoln Facility"); and (3) a cooking facility in Denison, Iowa (the "Iowa Facility") (collectively the "Facilities").

4

11.     PPP Holdings is a Delaware limited liability corporation and is the sole owner and sole member of Premium.  Pursuant to its Amended and Restated Limited Liability Operating Agreement, Premium was managed by its members; accordingly, PPP Holdings had the responsibility for the management and affairs of Premium.  When in business, PPP Holdings shared with Premium its principal place of business address, which was 4611 West Adams St., Lincoln, NE 68524.

12.     Defendant Matlin PE Holdings is a limited liability company organized and existing under the laws of the State of Delaware, has a principal place of business at 520 Madison Avenue, New York, NY 10022-4213, and is a single employer with the other Defendants and the PPP Entities, as that term is defined by the WARN Act.  It wholly owns and holds all of the membership interests in both defendants Matlin and Matlin Global Partners (which wholly owns Matlin Global Opportunities Partners).   Indeed, Matlin PE Holdings' principal business is owning Matlin and Matlin Global Partners.  Matlin PE Holdings is wholly owned by MatlinPatterson, LLC, which is jointly owned by David Matlin and Mark Patterson. David Matlin and Mark Patterson founded Matlin PE Holdings.  Matlin PE Holdings is in the same business as the other Matlin Defendants - Open Ended Management Investment.

13.     Defendant Matlin is a limited liability company organized and existing under the laws of the State of Delaware, has a principal place of business at 520 Madison Avenue, New York, NY 10022-4213, and is a single employer as that term is defined by the WARN Act. Matlin is a wholly owned subsidiary of Matlin PE Holdings.  Matlin was formed to, itself, make controlling investments and acquire controlling ownership of distressed companies.  It also was formed to act as the Administrative Agent for each company the other Matlin Defendants acquire directly or through each other, as well as to make material business, financial, and personnel

5

decisions with respect to those companies on behalf of itself and the other Defendants.  It acts as the investment advisor to the other Matlin Defendants and has investment authority over the securities the Matlin Defendants own.  In connection with Defendants' purchase of the PPP Entities and their subsequent loans to the entities, Matlin had this authority with respect to the PPP Entities.

14.     Defendant Matlin Global Partners is a limited liability company organized and existing under the laws of the State of Delaware, has a principal place of business at 520 Madison Avenue, New York, NY 10022, and is a single employer as that term is defined by the WARN Act.  Matlin Global Partners is a wholly owned subsidiary of Matlin PE Holdings and its principal business is to serve as the general partner of Matlin Global Opportunities Partners and Matlin Global Opportunities Partners Cayman, which Cayman entity shares the same New York City office address as all of the Defendants.

15.     Defendant Matlin Global Opportunities Partners is a limited partnership organized and existing under the laws of the State of Delaware, has a principal place of business at 520 Madison Avenue, New York, NY 10022, and is a single employer as that term is defined by the WARN Act.  According to Matlin Global Opportunities Partners,  it "was formed to invest globally in the severely discounted securities and obligations of financially distressed companies with the objective of obtaining corporate control."  The PPP Entities were examples of such distressed companies over which it, together with Defendants, gained corporate control.  Further, it has been defined as a fund "managed by" Matlin PE Holdings.

16.     Furthermore, upon information and belief, Matlin Global Opportunities Partners and Matlin Global Opportunities Partners Cayman were succeeded by MP D Cayman LP and MP PPP Cayman LP (hereinafter collectively referred to as the "non-party Cayman entities") in

early 2009, when these two entities were formed for the sole purpose of operating different aspects of Premium's business.

17.     Defendants and the PPP Entities shared many common officers/directors. Specifically:

- Mark Patterson is Chairman of Matlin PE Holdings and Matlin, as well as Director of Matlin Patterson Global Partners, which is general partner of the remaining Defendants.

- David Matlin is a member of Matlin PE Holdings and the CEO for both Matlin and Matlin Global Opportunities Partners.

- Matlin has the same partners (Frank Plimpton, Michael Watzky, and Christopher Pechock) as Matlin Global Opportunities Partners.

- As more specifically described below, Matlin appointed Peter Schoel, Michael Watzky (see above), Raphael Posner, and Doug Yakola to the Board of Directors of PPP Holdings.  Simultaneously while serving on PPP Holdings' Board, and, upon information and belief, also on Premium's Board, Schoel, Watzky, Posner, and Yakola were occupying positions on the management team of Matlin and some or all of the other Defendants.

- The same attorney who has provided legal services to and served on the Board of Directors as CFO for Matlin, Lawrence M. Teitelbaum, has served as legal counsel for Matlin Global Opportunities Partners.

- Robert Weiss has represented all of the Defendants in his capacity as legal counsel.

18.     Plaintiffs bring this action on their own behalf and, pursuant to the WARN Act, and Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class members who are all other persons similarly situated.

## FACTUAL ALLEGATIONS

19.     At all relevant times hereto, Premium employed between 300 and 400 employees at its various Facilities.

20.     In or about 2003, Steve Sands ("Sands") became the President and Chairman of the Board of Directors of Premium.

21.     On November 1, 2006, Defendants, collectively, by virtue of their relationship to each other, became majority and controlling direct/indirect owners of the PPP Entities and, thereafter, invested tens of millions dollars in the PPP Entities.  Among others, Marc Chadock ("Chadock"), who was at all times pertinent hereto a Matlin partner, was primarily responsible for making decisions concerning the PPP Entities on some or all of the Defendants' behalf. Given this role, Sands reported to and followed directions from Chadock.

22.     As the first decision that Defendants would make towards the end of controlling the PPP Entities, in 2006, Defendants caused the PPP Entities to "spin off" their Iowa facility.

23.     Also, in connection with its purchase of the PPP Entities, Matlin was given the rights under PPP Holdings' Amended and Restated Limited Liability Operating Agreement ("PPP Operating Agreement") to designate and/or replace a majority of PPP Holdings' directors as it saw fit.  In exercising this right, Matlin, at various times, appointed Schoel, Watzky, Posner, and Yakola to the Board of Directors of PPP Holdings.  Simultaneously while serving on PPP Holdings' Board, and, upon information and belief, also serving on Premium's Board, Schoel,

Watzky, Posner, and Yakola were occupying positions on the management team of Matlin and/or the other Defendants.

24.     In or about early 2007, Kevin Miller ("Miller") was hired to be the Chief Financing Officer of Premium.  Also in July 2007, Erin McDermott ("McDermott") was hired as the Human Resource Manager.   In October 2008, she was promoted to Human Resource Director.

25.     From 2006 to the middle of 2008, the PPP Entities had grown to be one of the largest processors of organic and natural beef in the country.

26.     In the middle of 2008, however, the financial state of the PPP Entities began to change.  It was then that the national and international demand for the PPP Entities' products began to steadily and significantly decline.

27.     When this occurred, Defendants took over completely the day-to-day operations of the PPP Entities, which included making personnel and strategic business decisions, and controlling all of the financial decisions for the PPP Entities.  In short, they took over the overall management of the PPP Entities' ordinary business.

28.     Among other things, Matlin and/or the other Defendants, through Matlin's partner Chadock and those Chadock appointed, made the following significant personnel decisions: (a) first to promote Miller to CEO but then to shortly thereafter replace him with a person whom Matlin hired, Kevin Yost ("Yost"); (b) to demote Sands from President to the position of Secretary and to hire Scott Vuchetich ("Vuchetich") as the President and Treasurer; (c) to terminate the PPP Entities' manager of the Hastings Facility, Mike Gager ("Gager"); (d) to hire Ronald Gould ("Gould") to replace Gager both as Plant and Regional Manager; and (e) to make Gould COO of Premium.

29.     In his capacity as Manager of the Hastings Facility, Gould received direction from Matlin and handled the day-to-day operations of the Facility, including, but not limited to, managing the employees who worked at that plant.  Gould also became the person to whom McDermott reported directly.

30.     Further, as early as in or about the middle of 2008 - when Matlin and/or the other Defendants hired Gould to manage the Hastings Facility – Gould informed the Matlin Group's employees that, if Premium did not begin to make a profit by April 2009, Defendants would shut it down.

31.     Thereafter, to make the PPP Entities successful again, Chadock and other individuals employed by Defendants made the strategic business decision in late 2008 or early 2009, that the PPP Entities should begin selling kosher products.  This marked a significant change in Premium's business model and was implemented despite the fact that Sands voiced his opposition to it.

32.     To be clear, as Chadock and others from Defendants were making these decisions and dealing directly with the employees working at the Facilities, it was disregarding completely any input from Sands.  In fact, Chadock, on behalf of Matlin and/or the other Defendants, eventually entirely excluded Sands from the day-to-day decisions being made about the PPP Entities.  Indeed, to the end of gaining complete control over the decisions being made about the PPP Entities, Chadock, in effect, relieved Sands from his responsibilities as an Officer and a member of the Board of Directors and sent him on fruitless business trips to physically remove him from the company.

33.     In addition, Chadock, on behalf of Matlin and/or the other Defendants, acting as a single employer, began using Sands, while he was still being paid by Premium, to search for

other companies in which Defendants, not the PPP Entities, could invest pursuant to their business purpose.

34.     Despite the decisions Defendants made concerning the PPP Entities, as early as April 2009, it became clear to Chadock and others employed by Defendants that the PPP Entities would never be able to generate enough profit to enable them to remain in business.   Upon information and belief, for some time before this, the PPP Entities had been losing hundreds of thousands of dollars per day by remaining open.   Nevertheless, no one from Defendants informed the employees that the PPP Entities had failed to recover financially such that Defendants now were doing what they had warned they would do, contemplating shutting the company down.

35.     In or about early June 2009, a meeting was held at the Cornhusker Hotel in Lincoln, Nebraska, to discuss the company's future.   This meeting will hereinafter be referred to as the "June 2009 Meeting."   Those who attended the June 2009 Meeting were, upon information and belief, Chadock, McDermott (who was the only Premium employee present), other officers/agents/employees of Defendants whom McDermott did not recognize,[2] and those individuals whom Defendants appointed to run the PPP Entities - Yost, Vuchetich, and Gould,

36.     At the June 2009 Meeting, Defendants' executives announced their decision to close the Facilities only three days from then.   In response, McDermott reminded Defendants' executives that the WARN Act required them to provide to their employees 60-days prior notice of a company shut-down.   One of the executives responded that the Matlin Group would not provide such notice because: (a) their attempts to make the business profitable had been

---

2   At all times pertinent hereto, McDermott, as well as Sands, were never sure about for which Matlin entity each person appointed by Defendants and speaking for Defendants was acting. Defendants' executives only referred to themselves as being from "MatlinPatterson."

unsuccessful - they were losing money (even though the Matlin Group had been losing money for many months before then); and (b) they believed that they could avoid having to provide such notice if the PPP Entities simply filed for bankruptcy.

37.     McDermott also informed Defendants' executives that the employees were entitled to be paid any accrued vacation time regardless of whether the employees were laid off, terminated, resigned, or retired.

38.     Defendants' executives deliberately scoffed at their moral and legal responsibilities to their employees.  Specifically, despite knowing their legal duties and with the intent to avoid their obligations under the WARN Act, ERISA, and the NWPCA, on or about June 10, 2009, Defendants executed on the decision they had made at the June 2009 Meeting, They closed the Facilities while disingenuously telling the employees that the closures were merely temporary furloughs.  In so doing, the Matlin Group failed to provide 60-days notice of the closings, and did not pay the employees all of their accrued vacation time on or before the next regularly scheduled pay day.

39.     Just weeks later, in July 2009, Sands and McDermott resigned because they were disheartened by and strongly disagreed with Defendants' refusal to honor their obligations to their employees.  Indeed, neither Sands nor McDermott made or had any input into the decision to close the Facilities.   Sands and McDermott also knew that the "furloughs" in June 2009 were effectively permanent because – absent a miracle – the plants were going to close and the PPP Entities were going to file for bankruptcy.

40.      Indeed, Sands and McDermott were correct. The employment decision affecting the Facilities was not a "furlough" but, rather, a permanent "plant closing" and "mass layoff" under the WARN Act.  From the initial "furlough" to the time when the PPP Entities declared

bankruptcy in November 2009, the Facilities were not reopened, the employees were not recalled, and no employee was told that the plants would not reopen or given a business justification for no notice under the WARN Act.  Instead, the PPP Entities merely left telephone messages every two weeks for their employees extending the purported "furloughs" by  two more weeks.

41.     As a result, for months, many of the Plaintiffs and the Class members were left in "job limbo," not wanting to attempt to seek alternative employment because they were being led to believe that they would be able to return to work within two weeks of the most recent call from the Matlin Group.

42.     On or about November 10, 2009 (the "Petition Date"), PPP Holdings executed a Written Consent of Sole Member of Premium Protein Products, LLC ("Written Consent"), providing that Premium would file a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code").  PPP Holdings filed its petition that same day as well.[3] PPP Holdings' Written Consent was signed by Posner, as "President of PPP Holdings," at a time when he also occupied the position of senior advisor and inside legal counsel for Matlin and/or the remaining Defendants, as well as an officer of Premium.[4]  Upon information and belief, Matlin's outside attorneys in New York City, Bracewell & Guiliani, not only were consulted by

---

[3]     The PPP Entities are not listed as a defendants in this action due to the fact that they filed for bankruptcy in United States Bankruptcy Court for the District of Nebraska, at Docket Numbers 09-43291 and 09-43292 (the "Bankruptcy Proceeding").  Individually and on behalf of others similarly situated, Linda Jarvis, Sara Villanueva, and McDermott, initiated adversary proceedings against the PPP Entities in the Nebraska Bankruptcy Court.  In or about June 2010, however, the PPP Entities were sold by way of auction.  Matlin, who was included on Schedule D - Creditors Holding Secured Priority Claims ("Schedule D") - in the Bankruptcy Proceeding as a secured creditor of the PPP Entities, upon information and belief, received a portion of the proceeds of that sale.  None of the Plaintiffs herein or the Class members, however, received any portion of the proceeds nor were their claims adjudicated.

[4]     Indeed, on Schedule D, MatlinPatterson listed Posner as its agent to receive correspondence on its behalf in the Bankruptcy Proceeding.

some or all of the Defendants in connection with the PPP Entities' filing for bankruptcy, but they drafted the Written Consent and other documents on behalf of PPP Holdings and Premium, which documents were filed in connection with the voluntary petitions.  The PPP Entities' bankruptcy actions were administered together and, ultimately the PPP Entities were represented by the same law firm, Husch Blackwell & Sanders, LLP.

43.     By their actions, the Matlin Group deliberately deprived Plaintiffs and the Class members of that which the WARN Act is intended to ensure - transition time to adjust to the prospective loss of employment, to seek and obtain other jobs, and, if necessary, to enter skill training or retraining that would have allowed them to compete successfully in the job market.

44.     Defendants knew or should have known at least 60 days prior to the first June 2009 "furlough" and definitely prior to entering bankruptcy that it was likely that the PPP Entities would be required to shutdown or have significant mass lay-offs because of the economic climate and business trends.

45.     Defendants' decision to "furlough" employees beginning in June 2009, on information and belief, was nothing other than a misguided and fraudulent attempt to evade the requirements of the WARN Act because there was no legitimate intention at the time of the first furlough or anytime thereafter to reopen the facilities.  Hence, all employees as of June 2009 should remain eligible for the WARN violation.

46.     The Matlin Group willfully, negligently, or recklessly failed to: (a) give adequate notice of the potential shutdown/layoffs as required by the WARN Act; and (b) to pay Premium's employees their accrued vacation pay as and when due.

47.     Defendants made these decisions solely to secure their collective interest in getting their over 30 million dollar Secured and Unsecured claims paid.[5]

48.     Also, Defendants failed to use their control over Premium to actively seek financing of the PPP Entities to save the PPP Entities or reopen the Facilities.  Instead, at most, from June to November 2009, Defendants offered to sell Premium and/or PPP Holdings for the inflated and exorbitant price of $18 million.[6]   Not surprisingly, only two offers were extended – one for $3 million and one for $11 million.  In offering to sell the PPP Entities at a price that was grossly inflated, Defendants were seeking only to benefit themselves at the expense of the PPP Entities and their hundreds of employees.

49.     Similarly, there is no indication that a potential financier would have declined to provide financing if Defendants had provided the 60-days prior notice under the WARN Act.

50.     Accordingly, without excuse or justification, Defendants showed no regard for their obligations to their employees working at the Facilities and has no defense for failing to provide Plaintiffs and the Class members with the required WARN Act notice and deciding to not pay all of the benefits to which they are entitled.

51.     When Defendants caused the PPP Entities to file for bankruptcy, it knew or reasonably should have known that Defendants, either as a direct or indirect creditor of Premium, would be paid a portion of the price at which the PPP Entities would be sold, but that such an amount would be wholly inadequate to pay their employees anything.  In fact, this is exactly what occurred.

---

5       Indeed, filing for bankruptcy would give Defendants the opportunity to obtain the repayment of some portion of their loans.  Seventy-one percent (71%) of the PPP Entities' total liabilities owed at the time of the bankruptcy filing was owed directly to Matlin and indirectly to the remaining Defendants.
6       At the time of the bankruptcy filing, the PPP Entities' assets were valued at $18 million, but this amount does not account for the over $45 million in liabilities they carried.

52.     At no time since June 2009 (including at any time after the November 10 bankruptcy filing) have Plaintiffs been paid the accumulated vacation pay or wages to which each is entitled.

## CLASS ALLEGATIONS

53.     Plaintiffs and the Class members repeat and re-allege the allegations of the preceding paragraphs as though set forth fully herein.

## A.     DEFINITION OF THE CLASS

54.     Plaintiffs and the other similarly situated former employees constitute a Class within the meaning of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

55.     The Class is defined as all of those employees who were employed by the Matlin Group (in facilities with greater than 50 employees), and who became "affected employees" because they suffered "employment losses" as a direct and proximate result of the plant closing and/or mass layoffs in June 2009 or thereafter, and to whom the Matlin Group failed to provide notice in compliance with the WARN Act.

## B.     NUMEROSITY

56.     The Class is so numerous as to render joinder of all members impracticable as there are over 500 former employees believed to be in the Class.  The identities of a majority of the Class members are presently unknown but are ascertainable through appropriate discovery.

## C.     EXISTENCE AND PREDOMINANCE OF COMMON ISSUES

57.     Common questions of law and fact are applicable to all Class members.

58.     The common questions of law and fact arise from and concern the following facts and actions:

a.     all Class members are former employees of the Matlin Group;

b.     all Class members enjoyed the protection of the WARN Act;

c.      the Matlin Group, as a single employer, terminated the employment of all the Class members;

d.      the Matlin Group, as a single employer, terminated the employment of the Class members without providing at least 60 days' prior written notice as required by the WARN Act;

e.      the Matlin Group, as a single employer, failed to pay wages to the Class members and failed to provide other employee benefits for the 60-working-day period following their respective terminations of their employment in violation of the WARN Act and the NWPCA.

59.      The questions of law and fact common to the Class members, as described above, predominate over any questions affecting only individual members, and thus, this class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**D.      TYPICALITY**

60.      Plaintiffs' claims are typical of the claims of other Class members.  All such claims arise out of the Matlin Group's failure to provide notice under the WARN Act and to timely disclose to employees that they would be laid off as a result of the plant closing and/or mass layoffs and claims under the NWPCA.  Plaintiffs and other Class members have suffered a common injury arising out of the Matlin Group's common course of conduct as alleged herein.

**E.      ADEQUATE REPRESENTATION**

61.      Plaintiffs will fairly and adequately protect and represent the interests of the Class members and have no interest antagonistic to or in conflict with those of other Class members.

62.      Plaintiffs have the time and resources to prosecute this action and have retained qualified counsel who have had extensive experience in matters involving employee rights, the

WARN Act, and federal court litigation. Plaintiffs intend to prosecute this action vigorously for the benefit of the Class members.

## F.   SUPERIORITY

63.   A class action is superior to other available methods for a fair and efficient adjudication of this controversy because individual joinder of all Class members is impractical. Furthermore, damages suffered by Class members may be relatively small when compared to the expense and burden of individual litigation, which would make it difficult or impossible for individual Class members to obtain relief. The interests of judicial economy favor adjudicating the claims of the Class on a classwide basis rather than an individual basis.

## G.   RISKS OF INCONSISTENT OR VARYING ADJUDICATION

64.   Class treatment is proper in this proceeding in order to avoid inconsistent or varying adjudications with respect to individual Class members. Separate actions by individual Class members would create a risk that adjudication of disputed issues of law or fact as to some of the former non-bargaining unit employees would be binding upon other Class members not party to the adjudication, or would otherwise substantially impair or impede their ability to protect their interests.

65.   Pursuant to Fed. R. Civ. P. 23(a), the Class meets all the requirements for class certification.

66.   Class certification is also authorized by the WARN Act, 29 U.S.C. § 2104(a)(5).

### STATEMENT OF CLAIMS

### COUNT I
### WARN ACT
**(All Named Plaintiffs v. All Defendants)**

67.   Plaintiffs, on behalf of themselves and the Class members, repeat and re-allege the allegations of the preceding paragraphs as if fully stated herein.

68.     Plaintiffs bring this action pursuant to 29 U.S.C. § 2104(a)(5).

69.     At all relevant times, Defendants and the PPP Entities, as a single employer, employed more than 100 employees who, in the aggregate, worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

70.     At all times relevant, each Defendant was an "employer" as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639.3(a).

71.     Specifically, the Defendants constituted a "single employer" of the Plaintiffs and the Class Members under the WARN Act in that, among other things:

        a.      The Defendants shared common ownership (with each other and with the PPP Entities);

        b.      The Defendants shared common officers and directors (with each other and with the PPP Entities);

        c.      All of the Defendants exercised *de facto* control over the labor practices governing the Plaintiffs and Class Members, including the decision to order the mass layoff or plant closing at the Facilities;

        d.      There was a unity of personnel policies emanating from a common source between Defendants and the PPP Entities; and

        e.      There was a dependency of operations between Defendants and the PPP Entities.

72.     The complete shutdown of the offices as "facilities or operating units" constitutes a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2), making all persons "affected employees" as a direct and proximate result of the failure to give notice as required under the WARN Act.

19

73.     Alternatively, the "furloughs" by Defendants resulted in an employment loss of more than 1/3 of the employees, at pertinent "single sites of employment," and as such constituted a "mass layoff" (or layoffs) within the meaning of 29 U.S.C. § 2101(a)(3) in that at least 33% of the total employees (excluding any part-time employees) and at least 50 employees (again excluding any part-time employees) experienced an "employment loss" at single sites of employment; or at least 500 employees (company-wide).

74.     Plaintiffs were longtime employees of Premium and/or PPP Holdings.

75.     Plaintiffs were laid off on or about June 2009 and thereafter without cause on their part as part or as the reasonably foreseeable consequence of a plant closing and/or mass layoffs ordered by the Matlin Group and are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

76.     The plant closings and/or mass layoffs resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(6), at one or more single sites of employment.  The Matlin Group failed to give written notice of the plant closing and/or mass layoffs to the "affected employees" prior to the actual date of the closings and/or layoffs.

77.     The WARN Act required that the Matlin Group give Plaintiffs at least 60 days prior written notice of termination of employment.

78.     Prior to the termination of employment, Plaintiffs did not receive written notice from the Matlin Group that complied with the requirements of the WARN Act.

79.     The Matlin Group failed to pay Plaintiffs their respective wages, salary, commissions, and bonuses for 60 working days following the respective terminations of their employment.

80.     The Matlin Group also failed to make pension and 401(k) contributions as required, and failed to provide health insurance coverage and other employee benefits under ERISA to Plaintiffs for 60 calendar days from and after the dates of the respective terminations of their employment.

81.     The Matlin Group's failure to provide Plaintiffs with at least sixty (60) days prior written notice of the termination of employment was a violation of federal law, the WARN Act. The WARN Act specifically provides that employers who violate the WARN Act are liable for "back pay" for each day of violation.  29 U.S.C. § 2104(a)(i)(A).

82.     Because of the Matlin Group's failure under the WARN Act, Plaintiffs are entitled to payment for their respective wages, salary, commissions, and bonuses for "the period for the violation, up to a maximum of sixty (60) days." 29 U.S.C. § 2104(a)(1).

83.     As a result of the Matlin Group's violation of the WARN Act, Plaintiffs have been damaged in amounts equal to the sum of: (a) their respective lost wages, salaries, commissions, bonuses, pension contributions and 401(K) contributions for 60 working days; (b) the health and medical insurance and other fringe benefits under the ERISA that they would have received or had the benefit of receiving, for a period of 60 working days after the date of their termination; (c) the medical expenses incurred during such period by them that would have been covered and paid under the Matlin Group employee benefit plans had that coverage continued for that period; and (d) interest for the time value of the lost wages and benefits.

**COUNT II**
**WARN ACT**
**(Claim of Other Similarly Situated Employees)**

84.     Plaintiffs, on behalf of themselves and other employees who were similarly situated, repeat and re-allege the allegations of the preceding paragraphs as if fully restated herein.

85.     At or about the time that Plaintiffs were discharged or shortly thereafter, the Matlin Group also discharged hundreds of other employees, the Class members, who worked for the Matlin Group and are similarly situated former employees.

86.     Pursuant to 29 U.S.C. § 2104(a)(5), Plaintiffs assert the claims raised in this proceeding on behalf of the Class members for them or their benefit.

87.     Each of the Class members is similarly situated to the named Plaintiffs in respect to their rights under the WARN Act.

88.     At all relevant times, the Matlin Group employed more than 100 employees who, in the aggregate, worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

89.     At all times relevant, the Matlin Group was an "employer" as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639.3(a).

90.     Specifically, the Defendants constituted a "single employer" of the Plaintiffs and the Class Members under the WARN Act in that, among other things:

        a.     The Defendants shared common ownership (with each other and with the PPP Entities);

        b.     The Defendants shared common officers and directors (with each other and with the PPP Entities);

22

c.      All of the Defendants exercised *de facto* control over the labor practices governing the Plaintiffs and Class Members, including the decision to order the mass layoff or plant closing at the Facilities;

d.      There was a unity of personnel policies emanating from a common source between Defendants and the PPP Entities; and

e.      There was a dependency of operations between Defendants and the PPP Entities.

91.     In June 2009 or thereafter, the Matlin Group effected one or more "plant closing" or "mass layoffs," as those terms are defined by 29 U.S.C. § 2101(a)(2) and (3).

92.     The complete shutdown of the offices as "facilities or operating units" constitutes a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2), making all persons "affected employees" as a direct and proximate result of the failure to give notice as required under the WARN Act.

93.     Alternatively, the layoffs by the Matlin Group resulted in an employment loss of more than 1/3 of those who were employed by Premium, at pertinent "single sites of employment," and as such constituted a "mass layoff" (or layoffs) within the meaning of 29 U.S.C. § 2101(a)(3) in that at least 33% of the total employees (excluding any part-time employees) and at least 50 employees (again excluding any part-time employees) experienced an "employment loss" at single sites of employment; or at least 500 employees (company-wide).

94.     The Matlin Group discharged each of the Class members in June 2009 or thereafter without cause on his or her part as part of a plant closing and/or mass layoffs.

95.     The plant closings and/or mass layoffs resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(6), at one or more single sites of employment.  The

Matlin Group failed to give written notice of the plant closings and/or mass layoffs to the "affected employees" as required by the WARN Act, 29 U.S.C. § 2102, prior to the actual date of the closings and/or mass layoffs.

96.     The Matlin Group was required by the WARN Act to give each of the Class members at least 60 days prior written notice of the termination of their employment.

97.     Prior to the termination of their employment, the Class members did not receive written notice from the Matlin Group that complied with the requirements of the WARN Act.

98.     The Matlin Group failed to pay the Class members their respective wages, salary, commissions, and bonuses for 60 working days following the respective terminations of their employment.

99.     The Matlin Group also failed to make the pension and 401(k) contributions and to provide health insurance coverage and other employee benefits under ERISA to the Class members for 60 days from and after the dates of the respective terminations of their employment.

100.    The Matlin Group's failure to provide the Class members with at least sixty (60) days prior written notice of the termination of their employment was a violation of federal law, the WARN Act.  The WARN Act specifically provides employers that violate the WARN Act are liable for "back pay" for each day of violation.  29 U.S.C. § 2104(a)(i)(A).

101.    Because of the Matlin Group's failure under the WARN Act, the Class members are entitled to payment for their respective wages, salary, commissions, and bonuses for "the period for the violation, up to a maximum of sixty (60) days." 29 U.S.C. § 2104(a)(1).

102.    As a result of the Matlin Group's violation of the WARN Act, the Class members have been damaged in amounts equal to the sum of: (a) their respective lost wages, salaries, commissions, bonuses, pension contributions and 401 (k) contributions for 60 working days; (b)

the health and medical insurance and other fringe benefits under the Employee Retirement Income Security Act ("ERISA") that they would have received or had the benefit of receiving, for a period of 60 working days after the dates of the respective terminations of their employment; (c) the medical expenses incurred during such period by such persons that would have been covered and paid under the Matlin Group's employee benefit plans had that coverage continued for that period; and (d) interest for the time value of the lost wages and benefits.

### COUNT III
### <u>NEBRASKA WAGE PAYMENT AND COLLECTION ACT</u>
**(Plaintiffs and the Class members v. Defendants, individually)**

103.   Plaintiffs, on behalf of themselves and other employees who were similarly situated, repeat and re-allege the allegations of the preceding paragraphs as if fully restated herein.

104.   At all pertinent times hereto, each of the Defendants were an "employer" under the NWPCA.

105.   As part of their employment with the Matlin Group, Plaintiffs and the Class members were each offered employment that entitled them to the right to obtain certain payments in the form of wages, salary, vacation benefits, bonuses, retention bonuses or deferred compensation.

106.   Plaintiffs and the Class members fully complied with all terms of their employment, and, yet, each Defendant made the deliberate decision to not honor payments to be made to them under the terms of their employment.

107.   Defendants' actions are in violation of the NWPCA, as a failure to pay earned wages, and, as this was willful, are subject to payment of a penalty in accordance with Neb. Rev. Stat. 48-1232.

PHIL1 2276389-1

108.    As a result of these said violations of the NWPCA, Plaintiffs and the Class members have been damaged in amounts equal to the sum of:  (a) their respective lost payments under the terms of their employment; and (b) attorneys' fees.

**WHEREFORE**, Plaintiffs and the Class members, demand judgment, against Defendants as follows:

a.    A money judgment in favor of Plaintiffs and the Class members, equal to the sum of "unpaid wages" as that term is defined under the NWPCA;

b.    Certification that Plaintiffs and the Class members constitute a single class;

c.    Attorneys' fees paid to Plaintiffs and the Class members, as well as a penalty payment, both as allowed by law on the amounts owed under the preceding paragraphs; and

d.    Such other and further relief as this Court may deem just and proper.

Dated:  August 15, 2012                    KLEHR HARRISON HARVEY BRANZBURG LLP

By:    */s/ David S. Eagle*
        David S. Eagle (DE Bar No. 3387)
        Sean M. Brennecke (DE Bar No. 4686)
        919 Market Street, Suite 1000
        Wilmington, Delaware 19801
        Telephone:  (302) 552-5508
        Facsimile:   (302) 426-9193
        deagle@klehr.com
        sbrennecke@klehr.com

        - and -

        Charles A. Ercole, Esquire*
        Lee D. Moylan, Esquire*
        1835 Market Street, Suite 1400
        Philadelphia, PA  19103
        Telephone: (215) 568-2852
        Facsimile: (215) 568-6603
        cercole@klehr.com
        lmoylan@klehr.com
        *Attorneys for Plaintiffs admitted Pro Hac Vice*

26