IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONTE J. WOOLERY, TYSHA MARIE SMITH, JACQUE S. WOOD, KURT GLEN, CRAIG L. MOORE, WAYNE E. BROWN, SHAWN A. MIXON, STEPHEN R. PORTER, STEPHANIE LINN SEAWALL, ROXANNA KIPP, JAVIER ENRIQUEZ, IVETTE RIOJAS, RICK OSTDIEK, LAVERNE D. LOEFFELHOLZ, SIMONA SMARANDA VAIPAN, MATT WILSON, and ROXANA NAJERA, Individually and as Class Representatives, | : | |
| | : | C.A. 12-726-RGA |
| Plaintiffs, | : | |
| v. | : | |
| MATLIN PATTERSON GLOBAL ADVISERS, LLC, MATLINPATTERSON PE HOLDINGS, LLC, MATLINPATTERSON GLOBAL PARTNERS II, LLC, and MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS II, LP | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

David S. Eagle, Esq., Wilmington, Delaware; Charles A. Ercole, Esq. (argued), Philadelphia, Pennsylvania; Attorneys for Plaintiffs.

Bradley R. Aronstam, Esq., Wilmington, Delaware; Michael C. Hefter, Esq. (argued), New York, New York; Attorneys for Defendants.

April 23, 2013
Wilmington, Delaware

*Richard G. Andrews*
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Pending is a 12(b)(6) motion to dismiss for failure to state a claim for which relief may be granted. Defendants MatlinPatterson Global Advisers, LLC ("MP Advisers"), MatlinPatterson PE Holdings, LLC ("PE Holdings"), MatlinPatterson Global Partners II, LLC ("Global Partners"), and MatlinPatterson Global Opportunities Partners II, LP ("MP Fund II") (collectively, the "Matlin Entities" or "Defendants") argue that Plaintiffs Monte J. Woolery, et. al., failed to state claims for relief under the Workers Adjustment and Retraining Notification Act ("WARN Act") and the Nebraska Wage Payment and Collection Act ("NWPC Act").

## BACKGROUND

This case is a putative class action claim filed by former employees of Premium Protein Products, LLC ("Premium"). (D.I. 21). As this is a motion to dismiss, all of the following allegations must be accepted as true and viewed in the light most favorable to Plaintiffs. Premium operated meat processing plants in Hastings and Lincoln, Nebraska. (*Id.* at ¶1). Defendants are various associated entities in the private equity business and are based in New York. (*Id.* at ¶2). Defendants are the former majority owners of Premium, having purchased a majority interest in Premium's parent company, PPP Holdings, LLC, in November 2006. (*Id.*). In this capacity, Defendants extended loans to Premium and/or PPP Holdings (collectively "PPP Entities") amounting to more than 30 million dollars. (*Id.*). The PPP Entities went out of business and declared bankruptcy in November 2009. (*Id.*).

Premium employees were permanently "furloughed" in June 2009, and officially laid off in November 2009. (*Id.* at ¶11). Plaintiffs seek to recover under the theory that the Defendants made the specific decision to conduct the layoffs in violation of the WARN Act. (*Id.*). The PPP

1

Operating Agreement designated complete control of the PPP Holdings Board of Directors to
Defendants. (*Id.* at ¶ 23). Defendants appointed the following individuals to the Board: Peter
Schoels, Michael Watzky, Raphael Posner, and Doug Yakola. (*Id.*). These individuals occupied
"positions on the management team" of Defendants while maintaining their respective roles with
the PPP Entities. (*Id.*). Mark Chodock, a Matlin partner, was primarily responsible for making
decisions concerning the PPP Entities for Defendants. (*Id.* at ¶ 21). When Defendants purchased
the Premium Entities, Steve Sands was the President of Premium and Chairman of the Board.
(*Id.* at ¶20). Chodock demoted Sands to Secretary, installed Scott Vuchetich as the new
President and Treasurer, and required Sands to act at Chodock's specific direction. (*Id.* at ¶28).
Chodock also installed Kevin Yost as CEO, terminated Mike Gager, the manager of the Hastings
facility, hired Ronald Gould to replace Gager as both the Plant and Regional Manager, and also
made Gould COO of Premium. (*Id.*).

After Premium's business began to decline in 2008, Defendants took over the day-to-day
operations of Premium. (*Id.* at ¶¶26-27). Defendants acted through Gould, who was put in
charge of the operations of the facility, including employee management. (*Id.* at ¶¶28-29). At
Defendants' behest, Gould informed employees that Premium would be forced to shut down if it
did not turn a profit by April 2009. (*Id.* at ¶30). To improve business, Chodock and other
employees of Defendants decided that Premium should sell kosher products, a decision opposed
by Sands. (*Id.* at ¶31). Chodock then decided to exclude Sands from day-to-day decisions, and
sent him on fruitless business trips to physically remove him from the company. (*Id.* at ¶32).
Sands was also sent to search for other investment opportunities for the benefit of Defendants,
not Premium. (*Id.* at ¶33).

2

It eventually became clear to Defendants that Premium was a failing business. (*Id.* at ¶34). A June 2009 meeting was held at the Cornhusker Hotel in Lincoln, Nebraska. (*Id.* at ¶35). Present at this meeting were Chodock, Yost, Vuchetich, Gould, Human Resources Director Erin McDermott, and unnamed representatives of Defendants. (*Id.*). Defendants' executives announced their decision to close the facilities in three days' time. (*Id.* at ¶36). McDermott responded that such a shutdown without 60 days' notice would violate the WARN Act. (*Id.*). One of the Defendants' executives responded that the Matlin Group would not provide such notice because the attempts to make the business profitable were unsuccessful and that the bankruptcy of the PPP Entities made such notice unnecessary. (*Id.*). The Hastings and Lincoln facilities were then closed, and the employees were wrongly informed that the closures were merely temporary furloughs, when in reality they never returned to work. (*Id.* at ¶¶38-40). The June 2009 furloughs became official terminations in November 2009. (*Id.* at ¶40). The PPP Entities entered bankruptcy that month. (*Id.*).

## DISCUSSION

In reviewing a motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to Plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406 (2002). "When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

Plaintiff's theory for recovery under the WARN Act asserts liability against the Defendants, also referred to as the "Matlin Entities," as the parent corporations of the now

3

defunct PPP Entities. Because employee layoffs are a necessary condition to WARN Act liability, and layoffs frequently presage a corporation's demise, plaintiffs frequently attempt to gain recovery from parent entities. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 477 (3d Cir. 2001). To gain recovery against parent entities, the former employees must show that the parent entities acted with the subsidiary as the "single employer" in making the wrongful termination decision. *Id.* The Department of Labor ("DOL") has issued regulations in connection with the single employer determination. 20 C.F.R. § 639.3(a)(2). These regulations call for a five factor balancing test to determine whether subsidiary and parent entities should be treated as a single employer. These factors are (i) whether the companies share common ownership, (ii) whether the companies share common directors and/or officers, (iii) the existence of de facto exercise of control by the parent over the subsidiary, (iv) the existence of a unity of personnel policies emanating from a common source, and (v) the dependency of operations between the companies. 20 C.F.R. § 639.3(a)(2). This balancing test is "intended to discover whether...normally separate entities actually functioned as a single business, particularly with regard to labor policy." *Pearson*, 247 F.3d at 498.

Important to this case, however, is the rule that the DOL factors are not rigidly applied. The DOL Test should be applied with the flexibility that the area of law requires. *Id.* at 491. Moreover, the result of the balancing test may not necessarily control the outcome of a given case, as the Third Circuit has stated that the "listed factors are not an exhaustive list" and that "a number of circumstances not specifically enumerated may be relevant." *Id.* at 478. Courts "take a more functional approach to determining whether or not to 'pierce the veil' under WARN by focusing on the nature and degree of control possessed by one corporation over another[.]" *Id.*

4

"Circumstances that demonstrate a lack of an arm's length relationship between the companies" should be considered under the analysis. *Id.*

The parties dispute the importance of the de facto control factor to the analysis. De facto control focuses on whether "the parent … was the decisionmaker responsible for the employment practice giving rise to the litigation." *Id.* at 503-04. Plaintiffs argue that this is the most important factor to the analysis, and that their strong showing of Defendants' de facto control over the PPP Entities' labor policies compensate for a weaker showing of the other factors. Defendants disagree, warning that adopting this perspective may jeopardize basic principles of limited liability ownership. Defendants further argue that, in any case, Plaintiffs have failed to allege Defendants' de facto control over the PPP Entities.

The Court agrees that the de facto exercise of control factor is a special factor. The Third Circuit has stated that a "particularly striking" showing of de facto control might warrant liability even in the absence of the other factors. *Id.* at 504. Further, the de facto control factor best encapsulates the Third Circuit's view that courts should "take a more functional approach…by focusing on the nature and degree of control possessed by one corporation over another" when undertaking the single employer analysis. *Id.* at 478.

Plaintiffs' allegations make a strong showing of this factor. They allege that Defendants took control of the day-to-day decisions of the company and dealt directly with Premium employees. Matlin partner Mark Chodock is specifically alleged to have personally made significant management changes within Premium. Chodock is alleged to have demoted Sands from President to Secretary, and to have relieved Sands from his responsibilities as an Officer and a Board of Director by sending Sands on fruitless business trips to physically remove him

5

from the company. This included sending Sands on trips to search for other investment opportunities for Defendants, not for the benefit of the PPP Entities. Further, Chodock is alleged to have personally fired Mike Gager, the manager of the Hastings facility and then to have closely managed his replacement, Ronald Gould. Chodock, with other unnamed Matlin individuals, also made the business decision to market kosher products. All of this can be considered "circumstances that demonstrate a lack of an arm's length relationship between the companies[.]" *Id.* at 491.

Most importantly, Plaintiffs allege that Defendants made the specific business decision giving rise to the litigation, i.e., to conduct the layoffs without 60 days' notice. Plaintiffs allege that a meeting in early June 2009 took place at the Cornhusker Hotel in Lincoln, Nebraska. This meeting was attended by "Ch[o]dock, McDermott (who was the only Premium employee present), other officers/agents/employees of Defendants...and those individuals whom Defendants appointed to run the PPP Entities – Yost, Vuchetich, and Gould." (D.I. 21, ¶35). The allegations that follow are key:

> At the June 2009 Meeting, Defendants' executives announced their decision to close the Facilities only three days from then. In response, McDermott reminded Defendants' executives that the WARN Act required them to provide to their employees 60-days prior notice of a company shut-down. One of the executives responded that the Matlin Group would not provide such notice because (a) their attempts to make the business profitable had been unsuccessful – they were losing money (even though the Matlin Group had been losing money for many months before then); and (b) they believed they could avoid having to provide such notice if the PPP Entities simply filed for bankruptcy.

(*Id.* at ¶ 36). Here, Plaintiffs specifically allege that Defendants made the decision to shut down the facilities, layoff the employees without 60 days' notice, and enter bankruptcy. These are the "precise decisions with which the WARN Act is concerned." *Austen v. Catterton Partners V, LP*, 709 F. Supp. 2d 168, 177 (D. Conn. 2010). Defendants argue that impermissible factual

6

inferences must be made from the allegations to attribute the statements in question to Matlin personnel. Specifically, Defendants argue that Paragraph 35 defines McDermott as the only Premium employee present at the meeting. According to Defendants, this necessarily implies that Yost, Vuchetich, and Gould are included within the "Defendants' executives" group also alleged as present. Paragraph 36 then states that "Defendants' executives" announced the closure of the facilities, and "one of Defendants' executives" made the statements regarding the refusal to comply with the WARN Act. Supposedly, because officials from the PPP Entities (Yost, Vuchetich, and Gould) are included in this group as "Defendants' executives" are defined in the complaint, there is no way to know that the statements in question were made by Matlin personnel. According to Defendants, to conclude as such would require an impermissible factual inference.

The Court does not agree that an impermissible factual inference is required.[1] There is a footnote to paragraph 35 that makes clear that the "one of Defendants' executives" who is referenced as making the incriminating statement was one of the unknown Matlin employees:

At all times pertinent hereto, McDermott, as well as Sands, were never sure about for which Matlin entity each person appointed by Defendants and speaking for Defendants was acting. Defendants' executives only referred to themselves as being from "MatlinPatterson."

(*Id.* at ¶35, FN 2). For this reason, the alleged statement may rightly be attributed to Defendants. The Court thus finds that Plaintiffs' allegations make a strong showing of the de facto control factor.

---

[1] To the extent that a factual inference is required, it should be viewed in the light most favorable to the Plaintiffs.

As to the remaining DOL factors, Defendants allow that Plaintiffs sufficiently alleged common ownership. (D.I. 25, p. 8). Defendants argue, however, that Plaintiffs make no showing under the next factor, which is whether the companies share common officers and/or directors. This factor looks "to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 498.

Plaintiffs allege that Schoels and Yakola occupied positions on the "management team" of one or more of the Matlin Entities while also members of PPP Holdings and directors of Premium, but the allegations as to those two individuals do not specify their exact roles with Defendants and are thus not sufficiently alleged. (D.I. 21, ¶17). Plaintiffs further allege that Michael Watzky, a Matlin Entity partner, served as a member of PPP Holdings and on the board of Premium. *Id.* They also allege that Raphael Posner was a "Senior Advisor" and "Inside Legal Counsel" at Defendants MP Advisers while also serving as a member of PPP Holdings and on the board of Premium. (*Id.*). Defendants point out that Watzky is alleged to be a "partner" at Defendants MP Advisers and MP Fund II and thus cannot be a common officer or director. It is fair, however, to interpret the allegations of his role with Defendants as falling within the scope of the factor. A partner in a partnership performs functions equivalent to a director in a corporation, as both capacities have powerful voting rights to determine the direction of the business. In fact, a partner is arguably a more significant role than a director, as a partner

8

necessarily has an ownership interest in the business.[2] For this reason, the allegations as to Watzky are sufficient.

Posner, however, is only alleged to be a "Senior Advisor" and "Inside Legal Counsel with MP Advisors. Defendants argue this is not the sort of "formal management position" recognized by the factor. The Court agrees that an inside counsel or senior advisor positions is not the type of "high level management position" sufficient to satisfy the common director or officer factor.

This leaves Watzky as the only sufficiently identified individual common to the formal management of the companies. Defendants point out that Premium is an LLC, and an LLC does not have a board. Defendants argue that impossible allegations need not be recognized by the Court. It is true that an LLC does not necessarily have a board. It is also true that an LLC is a flexible and highly customizable business entity. For example, a manager-managed LLC will have a board of managers, which is in many ways functionally equivalent to a board of directors. *See* Mark A. Sargent and Walter D. Schwidetzky, *Limited Liability Company Handbook* § 1:3. In any event, the Court need not resolve this dispute, because even if Watzky can be considered a common officer or director, the presence of only a single overlapping individual with overlapping management roles between the companies is not sufficient. This factor weighs in favor of Defendants.

This brings the Court to the fourth factor, which examines whether a "unity of personnel policies emanating from a common source" exists. Defendants argue that Plaintiffs have

---

[2] This would not be the case were the individual a limited partner. Without any indication otherwise, the Court views the allegations to be that Watzky was a general partner.

9

completely failed to make this showing. This factor requires a showing of whether the
companies actually functioned as a single entity with regard to their relationship with employees.
*Pearson*, 247 F.3d at 490. The Court must consider whether the two companies engaged in
centralized hiring and firing, payment of wages and personnel and benefits recordkeeping. The
Court finds that there is no allegation establishing this factor, as it would make no sense for
Defendants, who operate a private equity firm business, to share personnel policies with one of
its portfolio companies consisting of a meat packing business.

Likewise, the fifth factor, which examines whether the two companies have a
"dependency of operations," is not alleged. Courts look to the sharing of administrative or
purchasing services, interchanges of employees or equipment, and commingled finances. *Id.* at
500. The Court agrees with Defendants that "it defies logic and common sense to argue that
defendants, a New York-based private investment firm, and Premium, a Nebraska-based meat
processing plant, had a "dependency of operations." (D.I. 25, p. 18). Plaintiffs thus fail to allege
this factor.

Plaintiffs failed to sufficiently allege common officers or directors, a unity of personnel
policies emanating from a common source, or a dependency of operations. Plaintiffs did allege
common ownership, and most importantly, a strong showing of the de facto control factor. The
Court views this last factor as determinative in the Rule 12(b)(6) context, consistent with the
Third Circuit's statement in *Pearson* that if the showing of de facto control is "particularly
striking...then liability might be warranted even in the absence of the other factors." 247 F.3d at
505. Plaintiffs' allegations are indeed particularly striking, as they allege that Matlin personnel
ran roughshod over Premium management, independently made the decision to conduct the
layoffs, and scoffed at the WARN Act's requirements. Despite Defendants' arguments to the

10

contrary, giving the de facto control factor special weight does not "encourage the imposition of liability merely as a result of the control ordinarily exercised by a parent corporation of a subsidiary by virtue of its ownership[]," which was cautioned against by the Third Circuit. *Id.* at 490. These allegations exceed a parent's standard exercise of control pursuant to the ordinary incidents of stock ownership. They allege that Defendants leveraged their ownership interests to force violations of the WARN Act with knowledge of the illegality of their actions.[3] For this reason, the motion to dismiss is denied as to the WARN Act claim.

This brings the Court to Plaintiffs' NWPC Act claim.[4] The NWPC Act creates a cause of action for employees not paid wages owed within 30 days of a payday. Neb. Rev. Stat. § 48-1231. If the employer's failure to pay wages is determined to be willful, an amount equal to two times the amount of unpaid wages may be recovered. Neb. Rev. Stat. § 48-1232. Plaintiffs argue that if the Court determines that the allegations are sufficient to suggest single employer liability under the WARN Act, the Court should also determine that Defendants are subject to liability under the NWPC Act as the employer.

The Court disagrees. The United States Congress specifically empowered the U.S. Department of Labor to "prescribe such regulations as may be necessary to carry out" the WARN Act. *See* 29 U.S.C. § 2107. Pursuant to this power, the Department of Labor expanded the definition of "employer" to include companies that satisfy the single employer analysis. *See* 20 C.F.R. § 639(a). The NWPC Act, however, is brought under state law, and the Department of Labor's regulations have no effect on the state law claim. Because there is no indication that

---

[3] The Complaint paints the Defendants as Snidely Whiplash. Whether the proofs will bear that out is, of course, a separate issue for later.

[4] This issue may fairly be regarded as lightly briefed by the parties.

11

Nebraska ever intended NWPC Act liability to attach to parent companies, and the plain meaning of "employer" would not include the Defendants, Defendants' motion to dismiss the NWPC Act claim is granted.

An appropriate order will follow.